# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

===============
## NO. 03-05-00405-CV
===============

**Cheri Denise Buckingham, Appellant**

**v.**

**William Paul Buckingham, Appellee**

========================================================================
### FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 340TH JUDICIAL DISTRICT
### NO. C-04-0006-F, HONORABLE BARBARA L. WALTHER, JUDGE PRESIDING
========================================================================

## M E M O R A N D U M   O P I N I O N

This is an appeal from a final judgment of divorce in which a jury found, and the district court ordered, that appellee William Paul Buckingham should have the exclusive right to determine the primary residence of the children of his marriage with appellant Cheri Denise Buckingham and that the geographic location of the primary residence should be maintained in Tom Green County where both parents reside at the present time. Mrs. Buckingham challenges the legal and factual sufficiency of the evidence to support the jury's findings. We affirm the judgment.

## PROCEDURAL BACKGROUND

On January 5, 2004, Mrs. Buckingham filed an original petition seeking dissolution of her marriage to Mr. Buckingham joined with a suit affecting the parent-child relationship. In the petition, Mrs. Buckingham identified the parties' minor children—a ten-year-old daughter, K.D., and

a three-year-old son, L.A.—and stated that she believed the parties "may be able to reach an agreement concerning the conservatorship, possession, and support of the children." If they were unable to reach an agreement, Mrs. Buckingham requested that the parties be appointed joint managing conservators and that she be appointed as primary joint managing conservator of the children.

The parties were unable to agree which joint managing conservator should have the exclusive right to determine the primary residence of the children and what the geographic location of the primary residence would be, and a three-day jury trial was held beginning on October 19, 2004. At the close of the evidence, the jury was charged with two questions: (i) which joint managing conservator should have the exclusive right to determine the primary residence of K.D. and L.A. and (ii) whether that conservator should be permitted to designate the primary residence of the children without regard to geographic location or as limited to Tom Green County. The jury found in favor of Mr. Buckingham as the conservator who should have the exclusive right to determine the children's residence. The jury then determined that the primary residence of the children should be maintained in Tom Green County. In its final decree of divorce, rendered on December 23, 2004, the district court found it in the best interest of the children to appoint the parties as joint managing conservators with Mr. Buckingham to have the exclusive right to designate the primary residence of the children within Tom Green County.[1]

---

[1] Section 105.002 of the family code provides in pertinent part:

    (c)  In a jury trial:

        (1)  a party is entitled to a verdict by the jury and the court may not contravene a jury verdict on the issues of:

## ANALYSIS

Mrs. Buckingham challenges the legal and factual sufficiency of the evidence to support the jury's findings.[2] She contends that the record is "absent of anything that would have been done on the part of [Mrs. Buckingham] that would adversely affect the children." Specifically, she contends that there is no "direct" evidence that she had a romantic relationship outside her marriage and that "suspicion" is insufficient to support the jury's findings.

In evaluating the legal sufficiency of the evidence to support a finding, we must determine whether the evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005); *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 519 (Tex. 2002). We sustain a no-evidence point

(A) the appointment of a sole managing conservator;

(B) the appointment of joint managing conservators;

(C) the appointment of a possessory conservator;

(D) the determination of which joint managing conservator has the exclusive right to designate the primary residence of the child;

(E) the determination of whether to impose a restriction on the geographic area in which a joint managing conservator may designate the child's primary residence; and

(F) if a restriction described by Paragraph (E) is imposed, the determination of the geographic area within which the joint managing conservator must designate the child's primary residence. . . .

Tex. Fam. Code Ann. § 105.002 (West Supp. 2005).

[2] Because the appellant does not brief the issue of the extent of the geographic location, it is waived, and we will not address it. *See* Tex. R. App. P. 38.1; *Trenholm v. Ratcliff*, 646 S.W.2d 927, 934 (Tex. 1983).

3

if a finding is not supported by "anything more than a scintilla of evidence." *In re J.F.C.*, 96 S.W.3d 256, 265 (Tex. 2002) (citing *Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)). In making this determination, we must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller*, 168 S.W.3d at 827; *In re J.F.C.*, 96 S.W.3d at 266. If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable fact finder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing a factual sufficiency challenge, we consider and weigh all of the evidence in support of and contrary to the finding, and will set aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Id.* In making this review, we are not a fact finder, and we do not substitute our judgment for that of the jury, even if a different answer could be reached on the evidence. It is well established that the jury weighs the evidence, assesses the credibility of witnesses, and resolves conflicts and inconsistencies. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986).

The parties agree that in determining questions of conservatorship and access to the children that the best interest of the child is the primary consideration. *See* Tex. Fam. Code Ann. § 153.002 (West 2002). And they agree that the jury was tasked with determining the best interest of the child with respect to which parent should have the exclusive right to determine the primary residence of the children and the geographic limits of that residence. We turn to the evidence in this case on the issues presented to the jury.

Mrs. Buckingham first met Mr. Buckingham while she was out dancing with friends in Del Rio. They dated for one and one-half years before they married. Mrs. Buckingham had been married on three prior occasions and had a daughter, K.D., from a prior marriage. Mr. Buckingham had been married once before when he was twenty-four-years-old but had no children. When they married in 1997, Mr. Buckingham adopted K.D., and he is the only father K.D. knows. The couple then moved to Christoval in Tom Green County, and L.A. was born in November of 2000. Both grandmothers live in the county. The Buckinghams were both in their early forties at the time of trial.

After L.A.'s birth, Mrs. Buckingham, who had earned a Bachelor of Science degree in animal science and had worked outside the home, became a "stay at home mom," taking care of the children and the several horses and other animals on the 250-acre property they had purchased in 1998. Mr. Buckingham testified that he is a clinical social worker. When he and his family moved to Christoval, he was employed as a family therapist with the Texas Department of Health in San Angelo and ran the Children's Special Health Care Needs and Medically Dependent Children program for thirteen counties in the Concho Valley area. He also taught psychology courses in the evening at a college on the grounds of Goodfellow Air Force Base in San Angelo.

Both Mr. and Mrs. Buckingham had gone through bankruptcies. Mrs. Buckingham testified that she had undergone a bankruptcy as a consequence of her last husband leaving her with debt. As a result, the Buckinghams maintained separate bank accounts. Mr. Buckingham paid the bills and supported the family. Mr. Buckingham put Mrs. Buckingham on a budget and limited her expenditures for gas to $25 a week. She testified that she had "no idea" how much money her

5

husband makes. The couple had numerous arguments about money. Mrs. Buckingham testified that her husband became controlling and belittled her in front of other people.

The couple also disagreed about disciplining and educating the children. Mrs. Buckingham believed that Mr. Buckingham was harsh with K.D. and exhibited a bias in favor of the son born of their marriage. Mr. Buckingham believed that Mrs. Buckingham had K.D. wrongly diagnosed with attention deficit disorder and disagreed that she needed medication. At trial, Mrs. Buckingham testified that her daughter had problems at school, that she was diagnosed with attention deficit disorder, and that she improved with medication. She had discussed her daughter's problems with a pediatrician, filled out a questionnaire for him, and submitted paperwork from K.D.'s teachers. Mr. Buckingham was concerned that K.D. had not been evaluated in a clinical setting. Mrs. Buckingham adduced testimony from others, including K.D.'s doctor and a teacher, that the child improved after diagnosis and treatment by medication. Mrs. Buckingham testified concerning her involvement with the children and their activities and Mr. Buckingham's "controlling" behavior.

K.D.'s principal testified to some "behavior incidents" in which K.D. exhibited frustration and would "hit or shove or yell in class, those kinds of things" that no longer occurred after she began receiving medication. Two other teachers testified to their interactions with K.D. and her parents and that K.D. had become more focused and appeared to thrive with the medication. K.D.'s pediatrician, Dr. Wehner, testified to the process by which he obtained evaluation forms from K.D.'s teachers and determined that she possibly had attention deficit disorder:

> She was having trouble in school; she also was having some difficulty getting work done at home, and this had been an ongoing problem. And so the approach is to come and see me to evaluate to see if there's something more that could be done to help her succeed in the classroom.

6

He explained that the mother and teachers completed the standardized form containing a series of questions to match the symptoms with the criteria of the disorder. From the forms, he determined that her behavior was consistent with the disorder. After a physical examination, he made a diagnosis of attention deficit disorder and recommended "a trial of medication [to] improve her ability in the classroom." He testified that Mrs. Buckingham had been cooperative and that he had no reason to "doubt" her "role" with K.D. He also had a telephone conversation with Mr. Buckingham who had just become aware of the assessment and wanted the doctor to exhaust all alternatives before putting the child on medications.

The main source of conflict between the Buckinghams, however, was Kenneth DeZavala, who Mrs. Buckingham identified as a "very good friend" she met when she bought some hay for her horses from him. Their friendship developed and she agreed to help him open a feed store in Christoval and to manage the store when it opened. She felt she had found an opportunity for work where her children could be present.

Both Mrs. Buckingham and DeZavala testified that their relationship was a platonic friendship and was not a romantic relationship. DeZavala first called Mrs. Buckingham to see if the horses were eating the hay he sold her. She testified that he called again to inquire about how she was doing. Mr. Buckingham first learned of the contact between DeZavala and his wife when he received a call from a woman with whom DeZavala was living inquiring about who at the Buckingham home might have made a $60 collect call to her house. Shortly thereafter, DeZavala moved out of the woman's house. He testified that he bought a travel trailer and put it on nearby Lake Nasworthy for a couple of weeks. Mrs. Buckingham testified that she visited him there several times without her children to discuss "a business opportunity." Approximately two days after

7

DeZavala learned from Mrs. Buckingham that she had filed for divorce and the parties were separated, DeZavala moved his trailer onto the Buckingham property. During the month of January, he was unemployed. Thereafter, he obtained employment, and he and Mrs. Buckingham worked on plans for the feed store. On cross-examination, Mrs. Buckingham acknowledged that DeZavala often ate meals with her and the children:

> Q: And, as a matter of fact, Mr. DeZavala would just waltz into your kitchen and begin preparing food and cook, wouldn't he?
>
> A: He knocked before he came in.
>
> Q: Okay. So now then, Mr. DeZavala is in your home, making himself at home, eating your food, cooking food and eating with the children in the absence of their father?
>
> A: I make everybody feel comfortable when they come over to my house. They can come in. I tell them: My house is your house. You get whatever you need. I show them where the glasses are, where everything is. Yeah, I try to make everybody feel comfortable in my home.
>
> Q: Do you think that your very own children felt comfortable with this strange man in the house that was all of a sudden taking the place of their daddy?
>
> A: There has always been people in the house.
>
> Q: No, ma'am, that wasn't my question. I said, do your children feel comfortable?
>
> A: Yes, they did.

Mrs. Buckingham testified that DeZavala attended community events with her, including her daughter's soccer games, and that she introduced him at these events, all for the purpose of promoting the feed store. DeZavala eventually moved his trailer from the Buckingham property

because of gossip. After he moved his trailer, he continued to spend the night at the house. Mrs. Buckingham testified:

> Okay. He works at AEP, four ten's, sometimes five ten's a day, and I'm doing all the footwork for the feed store. And when he comes in in the evening, I discuss things with him, what I did that day, who I contacted, what kind of goods I'm going to get in the feed store; just certain things that have come up with the business, and we talk about it. If I was cooking supper, he would eat with us; and sometimes he would bring stuff and we'd cook supper and we'd talk about it, help K.D. with her homework. And he would sit down and watch TV waiting for me to put the kids to bed and he would fall asleep in the chair.

Prior to the Buckinghams' separation, the children regularly spent time with Mr. Buckingham's mother, Carmen Lewis. L.A. would stay with her two days a week. During the ten months of separation, L.A. saw Mrs. Lewis only five times, and Mrs. Buckingham acknowledged that she had interfered with the relationship the children had with their paternal grandmother. Mrs. Buckingham complained that the children behaved differently when they returned from visiting their grandmother: "If they made the transition easier coming back, there would not be a problem." During their separation, Mrs. Buckingham told K.D. that she was adopted and that Mr. Buckingham was not her real father.

From January 2004 until October 18, 2004, the time of trial, Mrs. Buckingham had worked for DeZavala in planning the feed store but had not earned any wages. She testified that she expected to receive a salary of $1,000 per month when the store opened. She also charged items on her credit card for the business "to build my credit up." DeZavala would pay off the amount owed each month. She testified that she owes "probably in the thousands," but could not recall the amount.

9

Mrs. Buckingham had never discussed divorce with Mr. Buckingham before she moved out. Mrs. Buckingham testified that she decided in August or September 2003 that she wanted a divorce and discussed it with her mother and various other people: "I was very unhappy how he treated me and how we handled things, or how he wanted me to handle things with the kids; that I had no say-so in how things were to be done." Although they did not discuss divorce, she testified that she had told her husband she was "unhappy, that I didn't agree with the way that he was wanting to do things with the children." Mr. Buckingham testified:

> I came home sick from work Monday, January 5th, and her truck was backed up to the porch and she was putting things in it. That was my first indication. And then when I walked in, she said she was leaving. I asked her why she was leaving. She said she was tired of it and didn't want this any more and was getting her stuff out. I asked her about the kids and said: Why don't you stay here and I'll move out for a little while and give things time to cool off. And she said, how can I say, expletives about not wanting this place or to be there, and so—she was leaving and she left.

She served him with divorce papers that afternoon. He moved in with his mother so he could continue to make payments to support the family, and Mrs. Buckingham could remain at home. He realized that the situation was not improving when he returned home to pick up his mail, and DeZavala's trailer was behind the house. He was also disturbed that Mrs. Buckingham had told K.D. that she was adopted: "It's not something that we had wanted to do behind my back." He was concerned that the disclosure had occurred while they were separated and DeZavala had arrived on the scene. Mrs. Buckingham also took the children to counseling without discussing it with Mr. Buckingham. He testified, "I feel like she's purposely trying to keep me away from knowing what is going on with the children."

10

At trial, Mrs. Buckingham acknowledged that Mr. Buckingham had visitation with the children and that he made all the visits. But she expressed concern that the children took some time after their visits with their father to return to their usual behaviors. L.A. was not as friendly and outgoing and his speech was not as clear: "He whines a lot more when he comes back." Mrs. Buckingham testified that she wanted the right to determine the children's residence because she had been their primary caretaker: "I make sure they get to where they need to go and pick them up. I get them involved in things that I know are good for them." She said, "They're everything to me."

Mrs. Buckingham testified that she had cooked for the children at the feed store when she was working and that her work did not interfere with her care for the children:

> I have been with [L.A.] all day long. [K.D.] gets off the school bus there at the feed store. She's done her homework. I've sat down and helped her with her homework at the feed store. We have her a little table set up where she knows she comes in, she empties out her book bag, I go over her homework with her, I get her started on it. [ L.A.] tries to play with her and, you know, we—I distract him. Him and I go and do things so she can do her homework. And my kids are not—they don't want for anything. I make sure that everything they need to do is done.

She explained that if the children are hungry at night, "I'll fix them something." The children then go to bed knowing DeZavala is at the house. Mrs. Buckingham testified:

> I don't have a problem with him staying there. My kids like him. When they get up in the morning, if he's there, a lot of times he's up; he's got to go to work. And they like [DeZavala] and they don't look at him as a stranger. There is a lot of—there's not very many people they do look at as strangers when it comes to the people that come in the feed store and the people that—He plays with them all the time.

Mr. Buckingham testified that he had always paid the bills and that they lived on a budget, but that Mrs. Buckingham "controlled most of the other situations." He agreed that he

11

disputed that K.D. needed medication and that they had disagreed about discipline of the children. Mr. Buckingham was concerned that L.A. had not been "potty trained" and that he often had a diaper rash. He testified that his extended family was available to take care of the children along with him and that he would encourage contact with Mrs. Buckingham:

> Like I say, with their mother or her family, I'm not going to keep the kids away from their family. You know, all she's got to do is ask and I'll give her extra time with them. That's not an issue. My concern is making sure that the kids are in a consistent environment so they can be that way all the time. If she wants extra time, that's great. But the problem I have is that all the time right now seems like it's not spent with the children. It's spent with leaving them somewhere or taking them to the feed store while they're working or doing things with Mr. DeZavala. And that's my concern.

Mr. Buckingham testified that his children would be his priority. He discussed his extended family in the area:

> I've got an aunt that lives right there across the street, like on the same block in Christoval from the school. My mom is here. She's retired also. I've got another aunt that is outside that has already agreed to help out. I've got cousins. I've got numerous people that have always said if I ever needed to drop the kids off or emergencies came up, that they would be there. So I've got a lot of support from family and friends.

Mr. Buckingham's mother, Mrs. Lewis, and his aunt testified to their close relationship with Mr. Buckingham and his children. Mrs. Lewis testified that before the separation she saw her grandchildren weekly. She was a school teacher for twenty-two years before she retired. She often kept L.A. two days a week, and K.D. often stayed with Mrs. Buckingham's mother. She testified that her son is the best father "I've ever known," is attentive to his children, and a loving father. She

12

explained that L.A. cries when he has to leave his father. When asked how the children act around Mr. Buckingham, she testified:

> I wish you could see them. I wish we could bring them in and just let you see them. His little boy especially is just—has gotten very clingy with him now and he cries to—that he won't have to go home, and when—when he has to go home. When he gets to the house, he runs to his daddy and just holds on to him. He won't let him out of his sight.

She recounted the various activities the children participate in with their father, including sports activities and picnics. Mr. Buckingham does not socialize with his adult friends when he has his children with him. Mrs. Lewis testified that she loved her grandchildren and had moved to Christoval to be close to them. Mr. Buckingham's aunt also testified that he was an exemplary father and "without a shadow of a doubt in my mind, with all my being, I know that [he] would provide and take care of these children."

One of Mrs. Buckingham's friends, who had known her for less than a year and did not know her husband, testified on her behalf that the children are generally happy, that they play at the feed store, and that they are cared for by Mrs. Buckingham. She recalled an exchange of the children between the Buckinghams in which L.A. was asleep and then began crying and would not immediately go to Mrs. Buckingham when she reached for him. She had never observed any behavior between Mrs. Buckingham and DeZavala to indicate that they were anything more than just friends and business associates.

Catherine Stone, a friend of Mrs. Buckingham who had been a student of Mr. Buckingham, testified on behalf of Mr. Buckingham: "I was a student of [Mr. Buckingham]'s, but

13

I was more of friends with [Mrs. Buckingham]." They became friends when Mrs. Buckingham let Stone's son ride horses on the property. Stone testified that she had moved away but returned to San Angelo in February 2004 for her own divorce proceedings. She also met DeZavala at the house. Stone had arrived at the house when Mrs. Buckingham drove up with DeZavala and introduced him to Stone as her friend. She learned of the Buckinghams' divorce from Mrs. Buckingham when she stayed with Mrs. Buckingham. When Stone asked about the trailer, Mrs. Buckingham told her it belonged to DeZavala and that he lived in it: "She said that he had parked the trailer there and he was staying there on the property." That evening, Stone was supposed to have dinner with Mrs. Buckingham and the children and spend the night at the house. Mrs. Buckingham told Stone that DeZavala usually cooked dinner and they left him cooking in the kitchen. As the evening progressed, it became clear that DeZavala was familiar with and "at home" in the house. He was familiar with the kitchen, he corrected K.D. at dinner, and he helped L.A. cut up his food and eat it. Stone testified that, after dinner, she had become tired and uncomfortable. She told Mrs. Buckingham that she would drive into San Angelo and get a room. She testified:

> I just felt uncomfortable with the whole situation. [DeZavala] kind of rubbed me the wrong way and I just felt incredibly uncomfortable just in the situation of him being there and the kids and knowing both [Mr. Buckingham] and [Mrs. Buckingham] and being in their home when they were together and seeing strange furniture and, you know, watching him correct the children and just doing dishes. I just felt uncomfortable. Something didn't seem right. He was a person that made me uncomfortable and I just didn't know what to say—want to stay.

DeZavala and Mrs. Buckingham appeared to be "very comfortable with each other." They continued to drink alcohol after dinner as they had that afternoon when they were driving Stone around town. At least one of the children was in the truck when they were driving and drinking. Stone recalled

that DeZavala did not appear to "be in any hurry to get out" to his trailer and "there was some small talk about K.D. wanted to stay in the trailer" when Stone decided to depart for San Angelo. She also recounted that it was a school night and, even though she left at 10 or 11p.m., the children were not yet in bed. She testified that "it appeared to me that [DeZavala] was staying there" and that it was "not merely a business arrangement between the two of them," but something more was going on between them.

Stone then testified in response to questioning that Mr. Buckingham took better care of the physical needs of the children and was more comfortable in the role of a parent and care giver than Mrs. Buckingham. She believed that he treated the children equally. She testified that in her opinion Mr. Buckingham would be the better provider of the children's physical needs and moral guidance. She testified:

> Based on my interaction with both of them and seeing the way they were with the kids and different things they have going on, it just seems to me that [Mrs. Buckingham] seems to be very concerned with starting up a new business and she goes out of town a lot. Up until the time I stopped talking to her, she was going out a lot with [DeZavala], different places picking this up and doing that. She just doesn't seem to have as much time to give to the children. Children need continuity and they need definite things. And somebody bouncing in and out of their lives and dropping them off at caregivers on what appears to be a whim and to pick up hay or whatnot just doesn't seem to be proper environment for children.

Stone explained that shortly after her February visit she and Mrs. Buckingham stopped talking to one another.

On this record, we conclude there is sufficient competent evidence to support the jury findings that Mr. Buckingham should have the exclusive right to determine the primary residence

15

of the children and that the district court did not err in designating him as the conservator with the right to determine residence. We may not substitute our judgment for that of the jury where it is the province of the jury to weigh the evidence, assess the credibility of witnesses, and resolve any conflicts and inconsistencies. *See McGalliard*, 722 S.W.2d at 697. Having reviewed the evidence under the appropriate standards, and in light of the ample evidence that Mr. Buckingham is a loving father on whom his children can depend for their physical and moral needs, we hold that the evidence is both legally and factually sufficient to support the jury's finding that Mr. Buckingham should have the exclusive right to determine the primary residence of the children. We overrule appellant's issues.

## CONCLUSION

Having overruled appellant's issues, we conclude that the evidence is legally and factually sufficient, and we affirm the judgment of the district court.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed: September 8, 2006

16